253 N.J. Super. 607 (1992)
602 A.2d 779
WAYNE STATHAM AND SHEILA STATHAM, PLAINTIFFS-RESPONDENTS,
v.
JACQUELINE R. BUSH, DEFENDANT-RESPONDENT, AND KENNETH L. SAEGER AND GRINNELL HAULERS, INC., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 6, 1991.
Decided February 13, 1992.
*609 Before Judges LONG, BAIME and THOMAS.
John C. Kennedy argued the cause for appellant (O'Donnell, Kennedy, Vespole, Piechta & Trifiolis, attorneys).
Leonard A. Weitzman argued the cause for respondent Wayne and Sheila Statham (Weitzman & Weitzman, attorneys).
Arthur Arnold argued the cause for respondent Jacqueline Bush (O'Toole & Couch, attorneys).
The opinion of the court was delivered by LONG, J.A.D.
Defendants Kenneth L. Saeger and Grinnell Haulers, Inc. appeal from a final judgment entered upon a jury verdict which awarded plaintiff, Wayne Statham, $519,630.00 plus prejudgment interest of $82,058.87 on account of damages he suffered as a result of an automobile accident. (Statham was a passenger in a vehicle driven by respondent Jacqueline Bush when the vehicle was struck from behind by a truck driven by defendant Saeger and owned by defendant, Grinnell Haulers.)
The facts of the case are as follows: At the time of the accident, plaintiff was 30 years old, married and a high school graduate. He had earlier completed two years of college, but did not finish. He worked for several years unloading coffee sacks and as a maintenance man. In 1985, plaintiff was hired by the United States Postal Service as a mail handler. He was assigned to work at the bulk mail facility in Kearny, New Jersey, where he often carried 70 pound bags of mail. While employed at the post office, plaintiff had received a letter of warning and several suspension notices for repeated tardiness *610 and unexplained absences prior to the January 18, 1988 accident.
Plaintiff was at work at the postal facility on the morning of January 18, 1988 when he made arrangements to meet co-defendant, Jacqueline Bush, for lunch. Bush drove over to the postal facility at approximately 1:00 p.m. in her 1979 Chevrolet Monza. This vehicle is a 2-door hatchback equipped with bucket seats and seat belts. Bush met plaintiff in the parking lot and then left for Bush's home in Irvington.
Bush was the operator and plaintiff occupied the front passenger's seat. Bush stated that she had buckled her seat belt but could not recall whether plaintiff had buckled his. Although plaintiff could not recall whether he buckled his seat belt, Dr. Stanley Siwek, plaintiff's original treating physician, testified that plaintiff had indicated to him that he was not wearing a seat belt at the time of the accident.
Bush testified that she turned onto an entrance ramp for Rt. 280 West after leaving the postal facility. The entrance ramp consisted of two lanes which proceed up an incline and then turned sharply to the left. Plaintiff recalled that after the Bush vehicle rounded the turn in the left lane, he and Bush glanced over to Rt. 280 East to see an accident which had occurred. He felt Bush's car wobble and skid and saw Bush ease off the gas. Plaintiff also testified that he then saw defendant's truck out of the corner of his eye and told Bush, "[t]his guy's gonna hit us." Thereafter, the impact occurred.
New Jersey State Trooper Christopher Miller was at the scene of the accident. He had been dispatched to the area to attend to an earlier accident in the east bound lanes of Rt. 280. Miller recalled that traffic in the west bound lanes of Rt. 280 started to back up due to rubbernecking by motorists and that he had to walk up a grass berm on occasion to move the west bound traffic along.
Miller testified that he was walking down the grass berm when he heard a "screech of brakes" and turned to see the *611 Bush vehicle heading West in the left lane of Rt. 280 at a speed which was a "lot less than the speed limit." Approximately two car lengths behind the Bush vehicle was the truck being driven by defendant. Defendant's truck hit Bush's car and both veered off the roadway down the grass berm. Plaintiff was ejected from Bush's car by the impact and landed on the berm approximately nine feet from where Bush's car came to rest.
Defendant stated that he was initially in the right lane on the entrance ramp to Rt. 280 West when he saw the traffic begin to back up in his lane. He then switched into the left lane and was travelling at about 25 miles per hour. As he rounded the curve, defendant saw the Bush vehicle about 20 feet ahead of him "going very slow." Saeger testified that he could not move to the right because of traffic and could not move to the left due to a railing. The left front wheel of Saeger's truck impacted with the right rear wheel of the Bush car and the vehicles then veered down the embankment.
Plaintiff was taken from the scene by ambulance and transported to University Hospital in Newark. He was transferred to West Hudson Hospital shortly thereafter, and came under the care of Dr. Siwek and Dr. Edmund Saad. Dr. Siwek noted that plaintiff had sustained a basal skull fracture, fractured ribs 9 and 10 on the right side, a fractured right humerus, a fracture-separation of the pubic symphysis, and an avulsion fracture of the transverse processes at L1 to L5 and a compression fracture at T3. In addition, plaintiff also sustained various hematomas. Dr. Saad, a Board-certified orthopaedic surgeon and treating orthopaedic specialist for plaintiff, testified that as a result of the injuries sustained in the accident, plaintiff suffered permanent partial disability. Furthermore, Dr. Saad opined that plaintiff could not do physical work which included bending and lifting more than 20 pounds.
Approximately six months after the accident, in July of 1988, plaintiff returned to work at the post office on light duty. He *612 was unable to do any type of bending or pulling, could not twist or turn, nor could he push or carry bags around the post office. Plaintiff worked at light duty from July of 1988 until April 9, 1989. During this eight month period, he was again criticized for his attendance record. Plaintiff testified that after his return to work following the accident, he had been late for his job and missed work on several days because he had to depend on someone else to drive him to work due to the medication he was presently taking which prevented him from driving. In addition, plaintiff stated that he was in so much pain from the injuries he sustained that he could not make it to the job. Plaintiff was subsequently fired due to his attendance record. Thereafter, plaintiff stated that he made numerous efforts to obtain a job, but was unable to do so. Furthermore, plaintiff testified that he wanted to work, but was restricted from doing any type of lifting, twisting or bending. In April of 1990, plaintiff found a temporary job as a summer camp counselor with the Community Corporation in Newark, New Jersey. However, this job concluded at the end of the summer.
Samuel Goodman testified as an expert as to plaintiff's employability. Goodman was qualified as an expert due to his background in the field of employment as the director of an employment agency for over 30 years, his courses in vocational education, and his teaching experience in vocational education. Goodman classified plaintiff as an "occupationally disabled worker." He testified that plaintiff was only employable in "light" or "sedentary" type jobs and therefore could only obtain employment in jobs such as a gate guard or a messenger. Goodman then compared statistics from the United States Department of Labor and New Jersey Department of Labor and concluded that the average pay for such jobs would be in the range from $5.00 per hour to $10.00 per hour, with an average of $6.00 or $6.50 per hour. Prior to the accident, plaintiff was earning $12.06 per hour.
Dr. Richard Ruth, an economist, testified for plaintiff as to the economic effect of this diminished earning capacity. Dr. *613 Ruth provided a methodology for calculating the future economic loss to plaintiff, based upon the difference from what he was earning in the past ($12.00 per hour) and the average of what he probably would earn in the future ($7.00 per hour). Based upon this methodology, the jury could have calculated lost future wages to be more than $513,000.00.
On October 4, 1990, the jury returned its verdict, finding defendant 100 percent negligent with respect to the accident that proximately caused plaintiff's injuries. The jury rendered an award in favor of plaintiff in the amount of $100,000.00 for pain and suffering, $19,360.00 for "past lost earnings," and $400,000.00 for "future lost earnings." Defendants moved for a new trial which motion was denied. This appeal followed.
Defendants contend that the trial judge erred in precluding them from submitting the seat belt defense to the jury; in allowing Goodman to testify as an expert; in permitting plaintiff to testify that he unsuccessfully sought work after his discharge from the postal service; in permitting the police report into evidence in the absence of the officer's testimony, and in awarding prejudgment interest on future lost earnings. They also claim that certain comments of defense counsel unfairly prejudiced the jurors.
We have carefully reviewed this record in light of the six contentions raised by defendants and have concluded that an affirmance is in order. In our view, the jury verdict was amply supported by the evidence. R. 2:11-3(e)(1)(B). The matters advanced by defendants as justifying a new trial are either not errors at all or, if errors, are insubstantial ones which do not warrant our intervention.
While defendants adduced sufficient facts from Bush, Dr. Siwek and plaintiff for the jury to conclude that plaintiff was not wearing his seat belt at the time of the accident, they failed to produce a witness who could establish which of plaintiff's injuries would have been avoided had a seat belt been worn. As the trial judge properly noted in precluding defendants *614 from submitting the seat belt defense to the jury, "[p]ublic policy and simple fairness dictate that we allow defendants to present the issue of seat belt use to juries where [the] defendant introduces satisfactory evidence that plaintiff's failure to use a seat belt increased the extent or severity of plaintiff's injuries." Waterson v. General Motors Corp., 111 N.J. 238, 270, 544 A.2d 357 (1988). What is essential is evidence sufficient to allow a jury to apportion plaintiff's damage. It is, after all, apportionment which is the point of the second injury distinction:
First collision injuries represent those injuries that would have occurred irrespective of whether or not the injured party used a seat belt. Second collision injuries are sometimes referred to as add-on or enhanced injuries, and are injuries that the use of a seat belt arguably could prevent. [111 N.J. at 252, 544 A.2d 357.]
See also Barry v. Coca Cola Co., et al., 99 N.J. Super. 270, 239 A.2d 273 (Law Div. 1967). Upon appropriate proofs, a jury is to "isolate the second collision or seat belt damages and determine the value of those damages." Waterson, 111 N.J. at 272, 544 A.2d 357. Dr. Siwek's testimony simply does not support the conclusion that plaintiff's injuries were enhanced by failure to wear a seat belt, or that the injuries connected to the lack of a seat belt, if any, could be isolated from the injuries which would have occurred irrespective of seat belt use and apportioned by the jury. As such, the seat belt defense was properly precluded.
As to Goodman, the trial judge stated:
Based upon Mr. Goodman's background in the field of employment as the director of an employment agency for over 30 years, his courses in vocational education, his teaching experience in vocational education, I will qualify, overrule the objection and qualify Mr. Goodman to testify as an expert in the field of employment and employability.
This was well within the trial judge's discretion and will not be disturbed by us. Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 141, 72 A.2d 204 (1950). Goodman's actual testimony was based upon an interview with plaintiff, review of plaintiff's medical records and an employability assessment he prepared based on published labor statistics. Nothing more is required.
*615 Plaintiff's testimony as to his unsuccessful efforts to obtain employment was likewise admissible to show his willingness to work and not to prove the truth of what may have been said to him by individual employers. See generally, State v. Johnson, 216 N.J. Super. 588, 599-600, 524 A.2d 826 (App.Div. 1987); State v. Kelly, 207 N.J. Super. 114, 120-21, 504 A.2d 37 (App.Div. 1986); Ringwood Assoc's Ltd. v. Jack's of Route 23, 166 N.J. Super. 36, 398 A.2d 1315 (App.Div. 1979).
Although the police report containing a statement by defendant which defendant denied making should not have been admitted in the absence of the officer, it was surely harmless error at most. This was a rear-end collision with respect to which there was ample evidence upon which the jury could determine that defendant was 100 percent negligent without regard to the police report.
Some of plaintiff's counsel's statements before the jury were objectionable. For example, the suggestion that the defense sent investigators around to check on plaintiff's employment had no evidential basis. Likewise, his expression of a personal opinion as to whether Ms. Bush did anything wrong was improper. However, each time these occurred they were cured by immediate intervention of the trial judge. The remainder of the comments, though not necessarily models for emulation, were well within acceptable bounds.
We turn finally to the issue of prejudgment interest on future lost earnings.
R. 4:42-11(b) provides in part:
(b) Tort Actions. Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort actions, including products liability actions, include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. (emphasis added).
Here, defendants urge that the trial judge erred in awarding prejudgment interest on future lost earnings because the "future *616 loss" had not yet been incurred and was therefore not compensable at present. Plaintiff counters that the trial judge properly applied the standards set forth in Ruff v. Weintraub, 105 N.J. 233, 244-45, 519 A.2d 1384 (1987) and permitted the interest award. In Ruff, the Supreme Court reaffirmed the two policy reasons warranting prejudgment interest which had been enunciated in Busik v. Levine, 63 N.J. 351, 307 A.2d 571 (1973) and reiterated Kotzian v. Barr, 152 N.J. Super. 561, 565, 378 A.2d 256 (App.Div. 1977): (1) to compensate the plaintiff for the loss of income that would have been earned on the judgment had it been paid earlier, and (2) encouragement of settlement. 105 N.J. at 244-45, 519 A.2d 1384. Although it characterized the first prong as "questionable in the case of future losses," the Court in Ruff held that the "public interest in encouraging settlements is an adequate independent basis for the application of the prejudgment interest rule in this case." Id. at 245, 519 A.2d 1384.
Defendants attempt to distance themselves from Ruff, arguing that "significant differences exist" between the two cases. They claim, for example, that, unlike Ruff where the verdict was predicated on "lost wages" in general, the present jury was called upon to make distinct decisions with regard to future and past wage losses. Thus, according to defendants, this case presents a clear basis on which to distinguish which losses the jury found to exist prior to trial and those determined to be subsequent.
This analysis overlooks the facts of Ruff in which the Supreme Court specifically identified the portion of the lost wages verdict which accrued prior to trial and the portion which was to accrue in the future. 105 N.J. at 242, 519 A.2d 1384. While the verdict in Ruff was expressed as a lump sum, the problem presented here was thus directly before the Court. More importantly, the case was reversed on other grounds and remanded for a new trial on damages. Id. at 246, 519 A.2d 1384. If the Supreme Court was inclined toward the view advanced here, it could have directed the trial judge to fashion the jury *617 interrogatories to break out past and future lost wages and ordered the application of prejudgment interest only to the former, suspending the running of interest on the latter as an "exceptional case" within the meaning of R. 4:42-11(b). This it did not do. Indeed, it stated the contrary:
[s]ince Rule 4:42-11(b) allows for the suspension of prejudgment interest, only in "exceptional cases," the trial court's assessment of prejudgment interest on the entire award was proper in this case. On remand, therefore, it would be appropriate for the trial court to award prejudgment interest on damages for both past and future losses. [105 N.J. at 245-46, 519 A.2d 1384].
Undergirding its conclusion was the Court's reliance on the primacy of the encouragement of settlement rationale underlying the rule. Where, as here, plaintiff's past lost earnings were clearly meager relative to plaintiff's future losses, the past and future interest distinction advanced by defendants would be no incentive to settlement or worse, a disincentive. Thus, it cannot be said that "the policy, spirit and intent of the rule are patently inapposite to the circumstances at hand." Kotzian, supra, 152 N.J. Super. at 565, 378 A.2d 256.
Further, the point behind the rule is not simply to make plaintiff whole for the actual losses incurred prior to trial, but to indemnify him for the loss of income he presumably would have earned had the "judgment" been paid earlier. Ruff, supra, 105 N.J. at 245, 519 A.2d 1384. "And with respect to the criticism that a verdict may embrace losses not yet suffered, the answer is that a verdict necessarily anticipates future experience, and the interest factor simply covers the value of the award for the period during which the defendants had the use of the moneys to which plaintiffs are found to be entitled." Busik, supra, 63 N.J. at 360, 307 A.2d 571.
The same result was reached by the Third Circuit Court of Appeals in Salas by Salas v. Wang, 846 F.2d 897, 908-11 (3d Cir.1988) where the district court had suspended the running of prejudgment interest on that portion of the lump sum award in a medical malpractice action which was related to medical and personal supplies and services which would be provided in the future. The court allowed interest only on the accrued out-of-pocket *618 expenses. The Third Circuit reversed on the basis of the reasoning in Ruff, concluding that although the "bulk of the damages," was prospective, this did not constitute exceptional circumstances warranting suspension of the prejudgment interest rule. Id. at 909-10.
It has not escaped our attention that the Supreme Court's unequivocal approval of the applicability of prejudgment interest to future losses as expressed in Busik, has given way to a less than enthusiastic imprimatur in Ruff where, the applicability of the compensation rationale for prejudgment interest on future losses was characterized as "questionable" and the entire issue as presented here by defendants was deemed "significant." 105 N.J. at 245, 246 n. 6, 519 A.2d 1384. This may portend a future change of heart on this issue. Nevertheless, given the presently articulated standards in Busik and Ruff, nothing about this case warrants suspension of the prejudgment interest rule.
Affirmed.