293 N.J. Super. 33 (1996)
679 A.2d 685
DALE SPRAGG, PLAINTIFF-RESPONDENT,
v.
SHORE CARE AND SHORE MEMORIAL HOSPITAL, DEFENDANTS-APPELLANTS, AND JUDITH DEMBY, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued June 12, 1996.
Decided July 19, 1996.
*38 Before Judges SHEBELL, STERN and NEWMAN.
Kathleen M. Connelly argued the cause for appellants (Genova, Burns, Trimboli & Vernoia, attorneys; Ms. Connelly, on the brief).
Mary J. Maudsley argued the cause for respondent (April, Maudsley & Goloff, attorneys; Ms. Maudsley, on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
Defendants, Shore Care and Shore Memorial Hospital, a licensed home health care agency and a hospital, respectively, are the former employer of plaintiff, Dale Spragg, a male certified home health aide (CHHA). Plaintiff sued defendants alleging sex discrimination in violation of the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 through -42, because of their gender-based policy of assigning male aides to male patients only, whereas female aides were allowed to care for patients of both genders. Defendants contended that there was a bona fide occupational qualification ("BFOQ") justification for the policy premised on the privacy rights of its female patients who refused to be treated by male aides. Defendants moved for summary judgment. After denial of the summary judgment motion, the action was tried to a jury which rejected the BFOQ defense and awarded plaintiff $3,657 for lost wages, $42,500 for emotional distress, and $27,000 for punitive damages. On or about November 28, 1994, defendants filed a motion for a new trial or for judgment notwithstanding *39 the verdict. On December 16, 1994, the judge denied the motion.
On appeal, defendants contend that the court should have ruled as a matter of law that they proved the BFOQ defense, that the court erred in excluding from evidence affidavits signed by female patients who refused to be seen by male aides and in submitting to the jury the issue of punitive damages, and that the emotional distress award constitutes a miscarriage of justice.
Plaintiff, a resident of West Cape May, earned his business degree from Stockton State College in 1985. He held numerous jobs in different fields, including that of retail sales clerk, landscaper, hotel desk clerk, and life insurance agent. The longest he was in any one position appears to be two years.
In May 1992, plaintiff, while unemployed, became interested in the health care field, as he had a couple of female friends who were nurses. He began training with defendant, Shore Care, for the job of home health aide. Shore Care is a home health agency that provides health care services to patients in their own homes. Among other services, health aides provide personal care to patients, including bathing them either in the bed, shower, or tub; taking care of their toileting needs; brushing their teeth; shampooing their hair, and the like. If time allows, the aides may perform housekeeping functions for the patients. A standard patient visit lasts two hours, three-quarters of the time being spent on providing personal services.
The training class for the home health aides lasted approximately three weeks, at the conclusion of which the trainees took their tests for state certification. Plaintiff took and passed this test, received his certification, and was hired as a home health care aide by defendant. Plaintiff was certified, by the State. His certification was good for one year and plaintiff allowed it to expire without renewing it, after termination of his employment by defendant.
*40 According to plaintiff, there was no difference in the training given to male and female home health aides. All trainees were taught how to administer personal care to both male and female patients. Plaintiff asserted he was never told that defendant assigned patients according to their sex. However, a supervising registered nurse who taught the trainees, claimed that another male aide in plaintiff's training class asked about defendant's assignment policy and that she specifically told the class that male aides cared for male patients only.
Plaintiff claimed that he had been told, when hired, that he would be working in lower Cape May County. When that did not happen, he complained. The company then divided the home health aides into teams in order to reduce their travel time. Plaintiff was assigned to Team 3, which comprised all of Cape May County as well as Margate and Longport, and plaintiff found he was going mostly to the upper end of his team's geographic area. Plaintiff felt that every time he asked to be assigned to patients closer to his home, he got the "runaround." Plaintiff maintained that, because he was assigned only to male patients, there were times when there were no patients for him to see. The female home health aides, however, were assigned to both sexes. Plaintiff spoke to several representatives of defendant about this policy.
First, plaintiff spoke to Isabel Mosca, who told plaintiff that she worked in personnel and had no involvement with the patient scheduling. Plaintiff next spoke to his immediate supervisor, Deborah Canty. Plaintiff told her that the policy was unfair and demeaning because it prevented him from doing his job. According to plaintiff, she said there was nothing she could do. Canty testified that she told plaintiff to talk to Joseph Aiello, defendant's director of home and convalescent services. When plaintiff continued to complain about the distances he had to travel, Canty also spoke to Judith Demby, director of clinical services, on his behalf and asked if plaintiff's first and last scheduled visits each day could be assigned closer to his home.
*41 Plaintiff went to another supervisor nurse, Ann Hall, on several occasions. According to plaintiff, Hall told him there was nothing she could do and said, "This is just a job. It's not a career." Plaintiff said he was hurt by this comment because he considered the job a career and he had had a lot of hopes and expectations for it. Hall testified that she could not remember ever making such a statement. Moreover, she asserted that plaintiff's complaints had to do mostly with the amount of travelling he was doing and the financial burdens such travel put upon him. She said he complained that his car was old, did not get good mileage, and needed frequent repairs. Hall suggested some budgeting ideas to him. When plaintiff asked Hall if he could be assigned female patients closer to him, Hall told him that she had never known a female patient willing to be cared for by a male aide.
Plaintiff claimed that when he spoke to Demby, she agreed with him that he was being discriminated against, but she told him that it would eventually work in his favor because male nurses were promoted to administrative and managerial positions more quickly than female nurses. Demby denied ever making such a statement. Rather, she said that when plaintiff told her he was thinking about a career in nursing, she told him that nursing was a good career and that he should pursue it. She told him to talk to the male registered nurses at Shore Memorial Hospital, one of whom had become a vice president of the hospital.
Plaintiff claimed that Demby also told him the segregation policy was for his own "protection." Plaintiff took this to mean that defendant was afraid of getting sued by female clients. Demby admitted that she made this statement, and that she told plaintiff it was not defendant's intent to discriminate, but that the nature of the work required female patients to be cared for by only female aides. She pointed out that he chose to live where he did and that he got reimbursed for his travel. Nonetheless, she agreed to speak to the person who did the scheduling in order to have his first and last patients assigned closer to home. She said that, after her conversation with plaintiff, she spoke to both the *42 scheduler and Aiello. Aiello assured her that it was impossible to change the gender segregation policy. Plaintiff admitted that, after he complained, defendant did try to accommodate him by giving him male patients closer to home. Plaintiff never spoke to Aiello directly, as had been recommended.
Plaintiff maintained that no one ever told him that the reason for the policy was the privacy interests of the female patients or that female patients had refused home health care from male aides. Plaintiff claimed that the gender segregation policy for male aides forced him to travel greater distances than the female aides. Although plaintiff was reimbursed for both his travel time and his travel expenses, he claimed that it took a month to get reimbursed and that, in the meantime, he had to put money out of his own pocket for the added gasoline and car phone expenses. Plaintiff believed that these expenditures would have been less if he had been assigned to care for patients of both sexes because there were female patients in areas closer to where he lived.
Plaintiff admitted he had no firsthand knowledge of anyone else's assignments, and that many factors went into assigning and scheduling patients, not just distance from the patients' homes to the aides' homes. Plaintiff agreed that he would not have complained about the gender policy if he had been assigned to all male patients closer to home in lower Cape May County, but noted this solution would not have resolved his "personal feelings" about being discriminated against. Plaintiff also agreed that if any particular female patient preferred not to be seen by a male home health aide, that was her right.
On February 25, 1993, after plaintiff had been working for defendant for nine months, plaintiff was at a patient's home in Ocean City when he received a call from his scheduler to report next to a patient's home in Mizpah. Plaintiff believed this location was outside of his team's geographic area, even though the scheduler assured him it was not. Plaintiff said he could not pay for the gas to get to there and asked if there were female clients closer that he could see. He was told that this was not the issue  *43 the issue was that a patient needed care. Ann Hall called plaintiff back and told him that he could not refuse to see a patient. According to plaintiff, when he told Hall that he did not have the money, Hall told him that if he did not go, he was terminated. Plaintiff was aware that home health aides were not allowed to refuse any assignment.
Hall testified that she offered to give plaintiff the money, but he said his car was too old for all this wear and tear and that defendant could find someone else to go. She tried to calm plaintiff down, but when she called him back a half hour later, he still had not changed his mind. When Hall warned him that, "you know what that means," plaintiff said that he was returning to the office to turn in his things. He did not finish any of his schedule that day, and turned in his equipment and asked for a receipt.
At the time of his termination, plaintiff was averaging a forty-hour work week, earning $7.62 an hour. He contacted several other home health care agencies in the area where he lived, but none paid as well as defendant. He could not find an acceptable job in the health care field, and ultimately, after being out of work from February 25 to June 1, 1993, took work as a head cook and manager of a restaurant.
During his three-months of unemployment, plaintiff had trouble paying his bills and was hounded by creditors. He claimed that he was a "wreck" over his situation and that he had to trade in his 1988 Grand Am with 100,000 miles on it for a 1984 Grand Prix with 128,000 miles. On cross-examination, plaintiff admitted that he had debts before he was hired by defendant. The parties stipulated that the most plaintiff could be awarded for lost pay was $3,657.
Joseph Aiello, defendant's director of home and convalescent services, was responsible for the overall operations of both the hospital and home health care agency. During the time plaintiff was employed by defendant, the agency had 550 patients, half of whom were female and sixty-five percent of whom were over the *44 age of sixty-five. During that time, defendant employed slightly more than 100 home health aides.
Defendant received approximately 200 patient referrals per month. Scheduling a patient started with a physician's referral and a physician's order which indicated how often the patient needed to be seen, for how long, and during what time of day. Defendant next considered the location of the patient and what aides were available. The agency tried to match the closest available aide to the patient because the less time an aide spent travelling, the more time could be spent with a patient and more patients per day could be seen. However, schedules changed continually because of changes in the doctors' orders, changes in the patients' schedules, and the hiring and firing of aides. The agency called the patient to set up the actual appointment and tell them who their aide would be.
When the agency first started, in 1985, there were no male home health aides. Aiello hired the first male aide in the fall of 1987. Because many of the nurses employed by defendant told Aiello that female patients would never accept personal care from a male aide, Aiello set out to prove them wrong. He believed that women would accept such services from a male. Accordingly, Aiello began assigning patients to the male aide regardless of the gender of the patient. On each occasion that Aiello called the patient to tell her that a male aide would be coming to her home, Aiello was "universally" rejected by the patient or her family.
Aiello continued to try to assign female patients to the male aide for a period of three months. He spoke to approximately seventy-five female patients during this period of time, out of a total female population of 150 to 175 patients. Not one female agreed. The result was that the male aide's time was underutilized and that scheduling took four times as long as usual in order to try and find a "match." Aiello also testified that he tried to convince the female patients to change their minds but that he was unsuccessful.
*45 It was at that point that Aiello decided to establish the practice of assigning male home health aides to male patients only. The policy was never formalized or put into writing  it was just a "practice" that was handed down. Aiello believed that if he had insisted on scheduling male aides with female patients, the patients would have gone elsewhere and defendant's revenues would have declined.
Aiello thought about alternatives to the gender segregation practice but the only ones he could come up with were unsuitable. For example, he considered buddying a male and female aide together on each visit, allowing the male aide to perform only the non-personal services. However, this was neither workable nor economically feasible since it would double the costs of each visit, which costs were not reimbursable by Medicare and Medicaid. Sending two aides for each visit would not cut the time spent on each patient in half because the overwhelming majority of time was spent on the personal services; also, defendant would have to reimburse two aides for their travel time to each house unless the two aides travelled together all day, and this would even further complicate the scheduling process. Aiello considered not hiring any male aides but believed that such a practice would have been discriminatory. Between 1987, when he hired the first male aide and the hiring of plaintiff in 1992, defendant had hired three other male aides.
Aiello said he never intended to harm anyone by the practice. He had intended only to honor the personal privacy rights of defendant's patients, and did not foresee that there would be any harmful effect on the male aides. No aide, male or female, was allowed to pick and choose his or her assignments. He would never allow, however, a patient to choose the race or religion of an aide because such a criterion was totally unrelated to any clinical factor. When asked whether his agency could ask each female patient if they wanted a male aide, Aiello responded that this practice would open the door to other customer preferences as well, such as race and religion. When asked what he would do if a *46 male patient refused a female aide, Aiello responded that he would take that into account when scheduling but that he did not develop a uniform practice for male patients because they had never expressed any qualms about a female aide being assigned to them.
When asked what a hospital would do if a female patient refused to be treated by a male doctor, Aiello responded that a hospital was different from a patient's home and that a doctor was different from a health aide. When questioned about the practices of his nearest competitors in the home health care field, Aiello stated that other agencies did not provide as much in the way of personal services as did defendant. At the time Aiello instituted this policy for defendant, he was unaware of any other agency's policy with regard to gender. However, he maintained that all of defendant's competitors currently had the same policy.
Deborah Canty testified at length regarding the process for rendering personal care to a patient at his or her home. First, the aide must completely undress the patient and drape him or her with a towel. A woman patient had to have her legs spread open and she had to be washed from front to back in the perineal area, with the aide making sure that the labia and folds were cleansed. The aide had to be sure that the remains of any bowel movement or urination were cleaned off the skin. If the patient were bed-bound, the aide would have to assist the patient in getting to the commode and would have to take off the patient's diaper or remove her panties. If the patient had an internal catheter, the aide had to drain the urine from it and then clean the catheter which, in the case of a female patient, was near the vaginal opening. The rectal and anal areas would then have to be cleaned to be sure they were free of bacteria which could then be introduced into the urethra. Aides were further instructed to check the patient's body for bruises, redness, swelling, or lumps in such areas as the breast, groin, and buttocks. Canty recalled an incident where a male and female team were to be sent to a female patient's house to use a lift to transfer the patient back to bed. The family was called first to alert them to the possibility that the *47 patient could become exposed during the transfer and that a male aide would be present. The family refused and a different aide was sent.
According to both Canty and Demby, plaintiff would not necessarily have travelled any less if he had been assigned to both male and female patients, as the agency did not have as large a volume of patients in the lower Cape May County area. Further, plaintiff would not necessarily have been entitled to the female patients in this area due to seniority rights, and it was not certain that the female patients in that area would have accepted care from a male aide. Although Demby never questioned any female patient about preferences, she believed that the "consensus" of home health aide supervisors was that female patients would not accept male aides.
Joanne Porter, defendant's business office supervisor, was responsible for reimbursing employees for their travel expenses. According to Porter, travel expense vouchers were turned in by the fifth of each month, and checks were cut on the fifteenth of each month. Porter did calculations regarding the hours worked and miles travelled by plaintiff each month. According to Porter's records, plaintiff averaged 149.44 hours work each month, compared to the female aides' monthly average of 116.21 hours. Plaintiff travelled 4.78 miles per hour worked, whereas the average female travelled 5.3 miles per hour worked. On cross-examination, Porter admitted she also calculated the total miles travelled by plaintiff for each of the nine months he worked for defendants, compared to the total number of miles travelled by the average female in Team 3 for those months. In only one month did plaintiff travel fewer miles than the average female. However, in many of these months, when ranked among the employees in Team 3, plaintiff placed close to or below the halfway point for miles travelled.
At the close of all the evidence, the court denied defendant's motions for judgment and its motions to dismiss emotional distress and punitive damages. The jury was charged on the law against discrimination and on the BFOQ. The jury was asked whether *48 defendant proved that its practice of not assigning male aides to female patients was reasonably necessary for its normal business operation and, if so, then to answer whether defendant also proved that it had no economically reasonable alternative to protecting the privacy rights of female patients other than to assign male aides to care for male patients only. Having answered the first question in the negative, the jury never reached the second question. The jury found that plaintiff proved that he was either terminated or constructively discharged as a result of the policy of assigning male aides to male patients. Based on its findings, the jury awarded plaintiff compensatory damages for lost wages and emotional distress totalling $46,157. It also found that defendant's assignment practice was malicious or wantonly reckless so as to entitle plaintiff to punitive damages. After being given defendant's financial statements for 1992 and 1993 and being instructed by the court on how to determine the amount of punitive damages, the jury awarded plaintiff $27,000.

I
Defendant contends that the Law Division judge erred in not granting its summary judgment motion, its motion for judgment, or its motion for judgment notwithstanding the verdict, because defendant had, as a matter of law, established its BFOQ defense.
The New Jersey LAD, in pertinent part, provides:
It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
a. For an employer, because of the ... sex ... of any individual, to refuse to hire or employ or to bar or to discharge ... from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment; ... provided ... that nothing herein contained shall be construed to bar an employer from refusing to accept for employment any person on the basis of sex in those certain circumstances where sex is a bona fide occupational qualification, reasonably necessary to the normal operation of the particular business or enterprise .. .
[N.J.S.A. 10:5-12(a) (emphasis added).]
*49 There is no published opinion in New Jersey dealing with the BFOQ defense. However, in the field of employment discrimination, our courts have traditionally looked to Federal law for guidance. Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 97, 570 A.2d 903 (1990); Kelly v. Bally's Grand, Inc., 285 N.J. Super. 422, 429-30, 667 A.2d 355 (App.Div. 1995).
Title VII of the Civil Rights Act of 1964 contains a BFOQ provision virtually identical to ours.
[I]t shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of his ... sex ... in those certain instances where ... sex ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.
[42 U.S.C.A. § 2000e-2(e).]
The United States Supreme Court has recognized that the BFOQ defense is narrowly written and should be narrowly read. International Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc., 499 U.S. 187, 201, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158, 174-75 (1991); Western Air Lines, Inc. v. Criswell, 472 U.S. 400, 412, 105 S.Ct. 2743, 2750-51, 86 L.Ed.2d 321, 332 (1985); Dothard v. Rawlinson, 433 U.S. 321, 333-34, 97 S.Ct. 2720, 2728-29, 53 L.Ed.2d 786, 799-800 (1977); see also Weeks v. Southern Bell Telephone & Telegraph Co., 408 F.2d 228, 232 (5th Cir.1969).
Regulations promulgated by the Federal Equal Employment Opportunity Commission (EEOC) indicate that the BFOQ exception as it relates to sex should be narrowly interpreted. 29 C.F.R. § 1604.2(a). In addition, the EEOC regulations provide that the following situations do not warrant application of the BFOQ exception:
(i) The refusal to hire a woman because of her sex based on assumptions of the comparative employment characteristics of women in general. For example, the assumption that the turnover rate among women is higher than among men.
(ii) The refusal to hire an individual based on stereotyped characterizations of the sexes. Such stereotypes include, for example, that men are less capable of assembling intricate equipment: that women are less capable of aggressive salesmanship. The principle of nondiscrimination requires that individuals be considered on the basis of individual capacities and not on the basis of any characteristics generally attributed to the group.

*50 (iii) The refusal to hire an individual because of the preferences of coworkers, the employer, clients or customers....
[29 C.F.R. § 1604.2(a)(1).]
New Jersey regulations dealing with BFOQs are those promulgated by the Division on Civil Rights which govern employment advertising. For the purpose of those regulations, the BFOQ exception "shall be interpreted so that individuals will be considered for employment on the basis of their individual capacities and not on the basis of any characteristics generally attributable to their group." N.J.A.C. 13:11-1.5(b).
Application of the exception is not warranted where based on assumptions of the comparative general employment characteristics of a particular group; stereotyped characteristics of such groups; "[c]ustomer, client, co-worker or employer preference, or historical usage, tradition or custom;" or the necessity of providing separate facilities of a personal nature. N.J.A.C. 13:11-1.5(d)(1)(4). "In regard to sex, the application of the exception may be warranted where it is necessary for authenticity or genuineness, such as for an actor or actress, or where the job in question necessarily involves intimate personal contact with persons of the opposite sex." N.J.A.C. 13:11-1.5(e).
It is generally recognized that utilization of the BFOQ defense by an employer falls into one of two categories: (1) based on the employer's perception that employees of a certain sex do not have the ability to physically perform the job ("ability to perform"); and (2) based on the employer's perception regarding the personal preferences of its customers or clients ("same sex"). Fesel v. Masonic Home of Delaware, Inc., 447 F. Supp. 1346, 1350 (D.Del. 1978), aff'd, 591 F.2d 1334 (3d Cir.1979); Sutton v. National Distillers Prods. Co., 445 F. Supp. 1319, 1325 (S.D.Ohio 1978), aff'd, 628 F.2d 936 (6th Cir.1980).
It has been recognized that in certain situations the privacy rights of individuals being served by an employer will justify sex-based classifications. These situations involve occupations in which the employee must work with or around individuals whose *51 bodies are exposed in varying degrees. Local 567 AFSCME, AFL-CIO v. Michigan Counc. 25, AFSCME, AFL-CIO, 635 F. Supp. 1010, 1012 (E.D.Mich. 1986); Norwood v. Dale Maintenance Sys., Inc., 590 F. Supp. 1410, 1416 (N.D.Ill. 1984); Fesel v. Masonic Home, supra, 447 F. Supp. at 1351. Notice may be taken of the fact that most people find it a greater intrusion of their dignity and privacy to have their naked bodies viewed, or personal services performed, by members of the opposite sex. Local 567 v. Michigan Counc., supra, 635 F. Supp. at 1013. "The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." York v. Story, 324 F.2d 450, 455 (9th Cir.1963), cert. denied, 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964). The right to privacy so as to support a BFOQ defense has been recognized in situations involving disrobing, sleeping, or performing bodily functions in the presence of the opposite sex. United States Equal Employment Opportunity Comm'n v. Sedita, 816 F. Supp. 1291, 1296 (N.D.Ill. 1993).
These privacy rights are not lost upon one's admittance to a hospital or because of the need for health care.
Although there will be a certain relinquishment of privacy by necessity when anyone is admitted to a hospital or mental health facility, this is not to say that a patient has forfeited all rights to privacy.... "It would be a strange doctrine ... that would decree that the sanctity of the right of privacy in the performance of excretory functions, fully respected in a public restroom, is forfeited by the fact of falling ill and becoming hospitalized."
[Local 567 v. Michigan Counc., supra, 635 F. Supp. at 1014 (quoting A. Larson, Employment Discrimination  Sex § 14.30, 4-8 (3d ed. 1980)).]
It must be understood that the burden is on the employer to establish the facts bringing it within the BFOQ exception. The employer must show that there is a factual basis for its conclusion that the essence of its business operation would be undermined by failing to employ members of one sex exclusively. See International Union v. Johnson Controls, supra, 499 U.S. at 201, 111 S.Ct. at 1204, 113 L.Ed.2d at 174. Supposition and conjecture are to be eschewed. The employer must prove that it has a basis in fact for its belief that no members of the sex in *52 question could perform the job adequately. The test is one of business necessity, not business convenience. Diaz v. Pan American World Airways, Inc., 442 F.2d 385, 388 (5th Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). Where the BFOQ is based on privacy considerations, such considerations must go to the core of an employee's job performance and that performance must be involved in the central purpose of the employer's enterprise. Hernandez v. University of St. Thomas, 793 F. Supp. 214, 216 (D.Minn. 1992).
Moreover, and most significantly in the present case, where the BFOQ is based on customer preferences, the employer has the additional burden to prove that there are no reasonable alternatives to the sex-based policy. That is, the employer has to show that, due to the nature of the operation of its business, it would not be feasible to assign job responsibilities in such a manner so as to avoid the conflict between the customers' privacy rights and the nondiscrimination principle of Title VII. EEOC v. Sedita, supra, 816 F. Supp. at 1295; Fesel v. Masonic Home, supra, 447 F. Supp. at 1351.
Thus, to satisfy its burden based on client privacy rights, an employer has to show that its clients would not consent to service by members of the opposite sex, and that clients would stop patronizing the business if members of the opposite sex were allowed to perform the service. EEOC v. Sedita, supra, 816 F. Supp. at 1296; Livingwell (North) Inc. v. Pennsylvania Human Relations Comm'n, 147 Pa.Cmwlth. 116, 606 A.2d 1287, 1291, appeal denied, 533 Pa. 611, 618 A.2d 401 (1992). These requirements ensure that the need for gender privacy is based on a true belief that the right to privacy is fundamental and not merely a preference to have a certain gender perform a certain role. Ibid.
These principles compel our rejection of defendant's argument that the court should have decided the validity of the BFOQ defense as a matter of law, either by way of summary judgment before trial, by dismissing plaintiff's claim at the close of all the evidence at trial, or by granting defendant's motion for judgment *53 notwithstanding the verdict following trial. There were genuine issues of material fact regarding the reasonableness of the employer's actions, if not its motivations in instituting the gender segregation policy, so as to preclude the court from concluding that defendant was entitled to judgment as a matter of law. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995); Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954); R. 4:46-2.
Defendant correctly argues that our law recognizes the BFOQ defense where an employer bases it upon the privacy rights of its customers in not wishing to have members of the opposite sex see them in various stages of undress. The recognition of such a defense, however, does not mean that the defense must be accepted as a matter of law instead of being presented to the jury as a question of fact. Cases cited by defendant for this proposition arose when the court accepted the defense in bench trials where the court, itself, was sitting as the trier of fact. See, e.g., Jones v. Hinds Gen. Hosp., 666 F. Supp. 933 (S.D.Miss. 1987); Norwood v. Dale Maintenance, supra, 590 F. Supp. 1410; Brooks v. ACF Indus., Inc., 537 F. Supp. 1122 (S.D.W. Va. 1982); Fesel v. Masonic Home, supra, 447 F. Supp. 1346; Backus v. Baptist Medical Ctr., 510 F. Supp. 1191 (E.D.Ark. 1981), vacated as moot, 671 F.2d 1100 (8th Cir.1982). Defendant has not cited any case where a judge took the issue away from the jury and decided it as a matter of law. We have found only one and find it readily distinguishable. See Healey v. Southwood Psychiatric Hospital, 78 F.3d 128, 135 (3rd Cir.1996).
We cannot say that no reasonable fact finder could have rejected defendant's BFOQ defense. In Little Forest Medical Ctr. of Akron v. Ohio Civil Rights Comm'n, 61 Ohio St.3d 607, 575 N.E.2d 1164 (1991), cert. denied, 503 U.S. 906, 112 S.Ct. 1263, 117 L.Ed.2d 491 (1992), on appeal from an administrative decision which followed a plenary hearing, the Ohio Supreme Court concluded that the defendant/nursing facility had not established that the privacy interests of its patients constituted a proper factual *54 basis for restricting employment of nurses' aides to females. 575 N.E.2d at 1170. The court distinguished Fesel v. Masonic Home, supra, by noting that the nursing facility in Fesel served only thirty residents, of which twenty-two were female, and employed only six to eight nurses' aides, whereas the facility in Little Forest served 256 patients and employed sixty-seven aides. The sheer size of the facility was assumed to afford a greater flexibility in scheduling work assignments. Id. at 1170 n. 3.
In addition, in Little Forest, supra, the court was concerned about the defendant's lack of a similar policy with respect to female aides. That is, whereas the court in Fesel, supra, was willing to engage in the assumption that male patients did not object to female nurses' aides, the Ohio court believed that the employer could not show the legitimacy of its policy without showing that the privacy interests of the male patients were also being accommodated by the present practice. Ibid.
The jury here may have believed that the sheer size of defendant's home health care enterprise  550 patients and 100 aides  coupled with its policy of sending female aides to service the needs of patients of both genders, rendered the BFOQ defense unsupportable. While defendant was not obligated to force any female patient to accept a male aide, the jury may have concluded that it would have been more reasonable for defendant to have inquired as to the desires of individual patients prior to scheduling.
A fact finder could have found that a preference inquiry was a very reasonable step, rejecting defendant's assertion that preference for gender would have opened the door to other impermissible preferences, such as race or religion. A reasonable fact finder could have determined, based upon the fact that Shore Care had not experienced a "wholesale" rejection of female CHHAs by male patients, that females would not universally reject a male CHHA. Furthermore, a reasonable fact finder could have discounted the defendant's good faith belief in the "privacy" of its patients because, although plaintiff had complained several times about the *55 policy, he was never told that it was to protect the privacy of the female patients.
Defendant makes no claim that the jury charge was improper. The jury was told that New Jersey recognizes a right to privacy not to be seen or touched when naked. Defendant had to show that it had a factual basis for believing that intrusion on these privacy interests was an essential part of the aide's job and that any alternative to a sex-based policy would have undermined the mission of its enterprise. Defendant could satisfy this burden by showing that its clients would not consent to service by the opposite sex and that they would stop patronizing the business if members of the opposite sex were allowed to perform the services. In finding that defendant did not satisfy its burden of proof, the jury resolved questions of fact raised by the evidence with respect to the preferences of defendant's clients and the reasonable responses to such preferences.
Many of the cases where the courts, sitting without a jury, found it reasonable for an employer not to assign male employees to female clients or patients were cases that were more than ten years old. Individual attitudes may well have changed toward males in "traditional" female occupations, especially those in the health care field. We cannot say that the court erred in letting the jury decide the issue.

II
We reject defendant's contention that the court erred in excluding from evidence out-of-court statements made by its female patients regarding their preferences for female home health care aides. Defendant claims error in the exclusion not only of affidavits signed by patients, but also of conversations between several patients and defendant's witnesses.
During the direct testimony of Aiello, defendant's director of home and convalescent services, he claimed that in 1993, after this litigation had started, he had surveyed his female patients to see if they felt the same way about male aides as they had back in 1987 *56 when the problem first arose. They signed and dated affidavits between September 21 and October 8, 1993. These affidavits, excluded on hearsay grounds, contain virtually identical language. The women identified themselves as female patients receiving personal care services from defendant, including bathing, dressing, hair care, mouth care, nail care, skin care to the breasts, buttocks, and perineal area, toileting assistance, bedpan assistance, diapering, and Foley catheter care. The women state that because of the highly sensitive, personal and private nature of these services, they would request a female home health aide, would refuse care from a male aide, and would seek care from another provider if defendant insisted that they accept a male aide.
Defendant's position is that the affidavits were not being introduced to prove the truth of the matters asserted in them. Rather, defendants urge, they were being introduced to show the continuing need for defendant's gender segregation policy and to show what effect any other policy would have on defendant's business enterprise.
The trial judge's ruling was that these affidavits constituted hearsay and were not being offered to prove why defendant did what it did back in 1987 when the policy was first instituted. The judge viewed them as representative only of the current preferences of patients and entitled to little probative value. It was noted that defendant could have obtained their sworn testimony by deposing the women, and that the affidavits were prepared post-litigation and represented the preferences of only eighty women, out of a total female population of close to 300.
It is well settled that hearsay is defined as those statements, other than ones made by the declarant while testifying at trial, which are "offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). So, for example, where statements are offered not for the truthfulness of their contents, but only to show that they were in fact made and that the listener took certain action as a result thereof, the statements are not inadmissible hearsay. Russell v. Rutgers Community Health Plan, Inc., *57 280 N.J. Super. 445, 456-57, 655 A.2d 948 (App.Div.), certif. denied, 142 N.J. 452, 663 A.2d 1359 (1995); see, e.g., Statham v. Bush, 253 N.J. Super. 607, 615, 602 A.2d 779 (App.Div. 1992) (plaintiff's testimony as to his unsuccessful efforts to obtain employment was admissible to show his willingness to work and not to prove the truth of what individual employers may have said to him); Jugan v. Pollen, 253 N.J. Super. 123, 136-37, 601 A.2d 235 (App.Div. 1992) (statements made to plaintiff by physicians were offered to prove that plaintiff limited his activity based on those statements being made to him, not to prove the truthfulness of the statements' contents); Chavanne by Chavanne v. Clover Fin. Corp., 206 N.J. Super. 72, 78, 501 A.2d 1024 (App.Div. 1985) (statements made by other children to plaintiff about his facial scar were not hearsay because they were not offered for the truthfulness of their content but to show how they were understood by plaintiff).
The affidavits, if reliable, were relevant to show that defendant had a reasonable factual basis for believing that a gender segregation policy was reasonably necessary in order for defendant to carry out the essence of its business enterprise. The issue was not whether a particular patient spoke the truth about her preferences, but whether Aiello, as the listener of these preferences, acted reasonably in light of the patients' alleged expressions of preference.
When a statement is offered to prove the probable state of mind it induced in the listener, such as to show information which the listener had which bore on the reasonableness or good faith of the listener's subsequent conduct, that evidence is not ordinarily excluded as hearsay. II John W. Strong, McCormick on Evidence § 249 at 103 (4th ed. 1992). However, such an out-of-court statement frequently has an impermissible hearsay aspect as well as a permissible non-hearsay aspect. Therefore, the rule generally is to admit such evidence with a limiting instruction, unless the probative purpose of the statement is substantially outweighed by the danger of its improper use. Id. at 103-04.
*58 In Zweig by Zweig v. E.R. Squibb & Sons, Inc., 222 N.J. Super. 306, 536 A.2d 1280 (App.Div.), certif. denied, 111 N.J. 614, 546 A.2d 533 (1988), for example, we held that product inserts regarding the dangerous side effects of drugs were properly excluded as hearsay even though the plaintiff contended they were only being offered to bolster the credibility of his expert witnesses. This was because the inserts would have had that bolstering effect only if the jury first accepted their contents as true. Id. at 310, 536 A.2d 1280. The same can be said here. Although it is true that the jury had to resolve whether defendant's gender segregation policy was grounded in a reasonable and good faith belief that the privacy interests of its patients were at stake, it is also true that defendant's good faith belief could not be ascertained or evaluated without the jury making a determination as to the reliability of the statements attributed to those patients. The assessment of reliability required a consideration of many factors including their truthfulness and sincerity as might be determined by a reasonable listener. Viewed in this light, the affidavits were being offered to prove the truth of the matters stated therein. We cannot say in these circumstances that the judge abused her discretion in excluding the affidavits where other proper means of proving defendant's position were available.
Defendant also claims error in the court's restriction of the testimony of Aiello, Canty, and Porter with regard to conversations they had with female patients. With respect to Aiello's testimony, an objection was raised when the witness began to testify regarding the results, back in 1987, of assigning defendant's only male aide to female patients. The court ruled that Aiello could testify as to the results without giving the substance of any specific conversation. Aiello then proceeded to testify that he spoke to seventy-five female patients over a period of three months, not one of whom consented to be seen by a male. We find no error with the court's ruling as Aiello, approximately seven years later, did not remember the names of any of these patients, and did not know how many of them were currently patients. *59 Moreover, the only non-hearsay aspect of the out-of-court statements was the effect that they had upon him. To the extent defendant wished to demonstrate the truthfulness of any patient's assertions, the substance of the conversations would have constituted hearsay.
Defendant raises similar claims with respect to Canty's and Porter's testimony. Canty had testified regarding an incident whereby a family of a female patient had refused the services of a male and female team to assist the patient back into bed with a mechanical lift. The court restricted the testimony to the fact that the family had objected, and did not allow in the substance of the conversation. Porter testified that once, in 1991, when she had been trained as a scheduler for a period of time, she had mistakenly assigned a male aide to a female patient. She was allowed to testify only that the female patient had refused the care. We find no error in either of these rulings. In any event, to the extent the full content of these conversations was excluded, we find such exclusion to be harmless error at best. R. 2:10-2.

III
Defendant maintains on the issue of punitive damages that the record is devoid of any evidence of wanton, reckless, or malicious conduct on the part of defendant so as to justify such an award. We agree.
Where subjective elements such as intent and motivation are involved, summary judgment is particularly inappropriate. Shanley & Fisher, P.C. v. Sisselman, 215 N.J. Super. 200, 212, 521 A.2d 872 (App.Div. 1987). The court was under no obligation to dismiss plaintiff's claim for punitive damages before hearing any live testimony. Brill v. Guardian Life, supra; Judson v. Peoples Bank, supra. However, at the conclusion of all the evidence, the court was in a position to grant defendant's motion. Reasonable minds could not differ on the issue of defendant's level of intent in instituting this gender-based policy. To justify an award of punitive damages under the LAD, the offending conduct must be *60 especially egregious and must constitute a deliberate act or omission with knowledge of a high degree of probability of harm or reckless indifference to consequences. Rendine v. Pantzer, 141 N.J. 292, 314, 661 A.2d 1202 (1995); Maczik v. Gilford Park Yacht Club, 271 N.J. Super. 439, 446, 638 A.2d 1322 (App.Div.), certif. denied, 138 N.J. 263, 649 A.2d 1284 (1994). Not every instance of unlawful discrimination, by itself, will give rise to punitive damages because they are to be awarded only in the exceptional case. Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476, 500-01, 638 A.2d 1341 (App.Div.), certif. denied, 136 N.J. 298, 642 A.2d 1006 (1994). Such damages constitute a sort of hybrid between traditional principles of criminal and tort law. Maczik v. Gilford, supra, 271 N.J. Super. at 449, 638 A.2d 1322.
The purposes of such an award are to punish the wrongdoer and to deter others from doing the same thing. However, it is not enough that defendant discriminated. There must be a finding that defendant discriminated with a reckless disregard for the rights of plaintiff and that it was wanton and willful. Accepting as true all the evidence which supported plaintiff's position and according him the benefit of all inferences which could reasonably be drawn therefrom, reasonable minds could not differ on the issue of whether defendant's gender segregation policy was egregious, malicious, evil-minded, and "exceptional." Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969); Malin v. Union Carbide Corp., 219 N.J. Super. 428, 435-36, 530 A.2d 794 (App.Div. 1987); R. 4:40-1 (judgment at close of evidence); R. 4:40-2(b) (judgment notwithstanding the verdict).
This record is simply devoid of anything approaching the level of maliciousness on defendant's part. Although plaintiff complained that he had never been told that the reason for the policy was the female patients' asserted privacy rights, plaintiff himself admitted that he had never confronted Aiello about the policy. Those employees plaintiff went to were without authority to change the policy. Plaintiff admitted that if any particular female patient had complained, he would have respected her right to *61 refuse the services of a male aide, and that he probably would not have complained at all if he had been assigned all male patients closer to his home. There is no indication that defendant intentionally sought to impair the rights of male employees. Defendant at worst chose the "wrong" way to correct a perceived problem involving the rights of patients. This did not establish that defendant acted wantonly and willfully or with deliberate disregard for the rights of its male aides. If anything, Aiello's testimony demonstrated how defendant was concerned enough to seek ways to avoid any gender segregation policy.

IV
Lastly, defendant contends that the award of $42,500 in emotional distress damages constituted a miscarriage of justice so as to warrant a new trial on this issue. Emotional distress damages are recoverable under the LAD. When amending N.J.S.A. 10:5-3 in 1990, L. 1990, c. 12, § 1, the Legislature specifically authorized the recovery of such damages.
The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruption; and adjustment problems, which particularly impact on those protected by this act. Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.
[Ibid.]
In addition, the accompanying Assembly Judiciary, Law and Public Safety Committee Statement noted that the statute was to be liberally construed so that all common-law remedies would be available to victims of discrimination. Rendine v. Pantzer, supra, 141 N.J. at 312, 661 A.2d 1202; Catalane v. Gilian, supra, 271 N.J. Super. at 499, 638 A.2d 1341. Emotional distress is thus a *62 probable consequence of discrimination and one of the "personal hardships" envisioned by the Legislature when giving relief to such claimants. Ibid.
The record, however, must demonstrate a substantial basis for such an award of damages for distress. Abrams v. Lightolier, Inc., 841 F. Supp. 584, 593 (D.N.J. 1994), modified on other grounds, 50 F.3d 1204 (3d Cir.1995). Where the award is based on personal humiliation or indignity suffered by the plaintiff, such indignity must be the natural, proximate, reasonable and foreseeable result of the discrimination. Gray v. Serruto Builders, Inc., 110 N.J. Super. 297, 315, 265 A.2d 404 (Ch.Div. 1970). Here, plaintiff's proofs were extremely thin, if not superficial, regarding the emotional suffering he endured as a result of defendant's policy, as were his proofs regarding the disruption to his life following the loss of his job.
While the Legislature recognized that personal hardships may include economic loss, homelessness, relocation, and disruption to one's career, education, family, and social life, N.J.S.A. 10:5-3, none of those factors were present here. Plaintiff was out of work for three months, largely because he chose not to take a job in the same field for less pay or where he would have to do more travelling. Plaintiff did ultimately leave the health care field, however, his "career" lasted only nine months  somewhat comparable to the other careers he had pursued over the previous decade of his life. The job he lost paid only a gross of $15,000, and it appears that comparable income was available to him elsewhere within a relatively short time. Further, he had devoted less than one month to be trained for this career. Moreover, although his employer provided a tuition reimbursement program for continuing education, plaintiff did not avail himself of that benefit, despite his assertions that he had intended to become a nurse.
Accepting plaintiff's testimony that he had trouble paying his bills during his period of unemployment, it is clear that he had been in debt and unemployed before he started working for *63 defendant. He lived alone and did not have a family to support, and his greatest loss during his three months of unemployment was that he had to trade in one old car for another.
A trial court should set aside an excessive verdict only in a clear case. The court should consider the evidence in the light most favorable to the injured party and should not interfere with the verdict unless it shocks the judicial conscience. Caldwell v. Haynes, 136 N.J. 422, 431-32, 643 A.2d 564 (1994); Baxter v. Fairmont Food Co., 74 N.J. 588, 596-97, 379 A.2d 225 (1977). On appeal, the reviewing court must give deference to the trial court's "feel of the case" with respect to those factors that are not apparent from the record itself. Caldwell v. Haynes, supra, 136 N.J. at 432, 643 A.2d 564; Dolson v. Anastasia, supra, 55 N.J. at 6, 258 A.2d 706. The trial court's ruling should not be reversed unless "it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. These principles apply with equal force to awards of emotional distress damages under the LAD. Rendine v. Pantzer, supra, 141 N.J. at 312, 661 A.2d 1202. The judge's order denying defendant's motion for a new trial on this issue states that the motion in its entirety was denied for the reasons stated on the record, but we received no transcript of oral argument or oral opinion.
In assessing emotional damages, no precise measurement can be made between a monetary amount and the degree of one's physical or mental suffering. Rather, the only method for evaluating damages is to identify such an amount as reasonable persons estimate to be fair compensation. Goss v. American Cyanamid Co., 278 N.J. Super. 227, 240, 650 A.2d 1001 (App.Div. 1994). Recognizing the above principles, we conclude that the award of $42,500 in emotional distress damages is so excessive as to represent a miscarriage of justice in light of the evidence presented.
We affirm the award of compensatory damages. We vacate the punitive damages award and remand for reconsideration of the *64 motion for a new trial on the award of $42,500 for emotional distress. We suggest the use of a remittitur to the trial judge.
Affirmed in part; reversed and remanded in part.
STERN, J.A.D., concurring.
Judge Shebell's opinion persuasively demonstrates why a jury question was presented with respect to the bona fide occupational qualification defense and why the jury may have concluded that defendant did not sustain its burden with respect to that defense. The jury could have found, as Judge Shebell explains, "that it would have been more reasonable for defendant to have inquired as to the desires of individual patients prior to scheduling" (slip op. at 24) or that defendant did not show it considered such an alternative or updated its policy at any time over a six year period from the time the assignment policy was developed.
Joseph Aiello testified that over a four month period in 1987 approximately 75 female patients or their families "universally rejected" the use of a male aide. Defendant endeavored to show the continuing reasonable basis for its policy by introducing affidavits of approximately 80 female clients who indicated their insistence that only female home care aides be provided and that they would "terminate" defendant's services if their preference was not honored.
The majority concludes that the affidavits were inadmissible hearsay testimony. "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). However, the affidavits were offered, in counsel's words, "for an affirmation of [defendant's] current practice," and "to show the motivation for the practice and the effect on the hearer" in maintaining the policy. While being less than precise, trial counsel insisted that the affidavits were not "offered for the proof of the matter asserted." Moreover, even though the affidavits appear to embody client preferences after the complaint was filed, those preferences appear to be the same as at the time the *65 assignment policy was initially made approximately six years earlier, and an inference flows that defendant's understanding of patient preferences was the same in the interim.
I would affirm the trial judge's determination that the affidavits were inadmissible even if they did not constitute hearsay.[1] In response to the judge's comments, defendant never indicated it would offer testimony about how the affidavits were prepared, obtained or executed.[2] While N.J.R.E. 101(a)(5) provides that the Rules of Evidence "shall not be construed to prohibit the use of an affidavit in lieu of oral testimony to the extent permitted by law," the rule was primarily designed to codify "the practice by which proofs are permitted by affidavit in lieu of oral testimony in ex parte matters, on motions, and in other proceedings." 1991 Supreme Court Committee comment to N.J.R.E. 101(a)(5). See Biunno, Current N.J. Rules of Evidence, comment to N.J.R.E. 101 (1996 ed.) at 4. As the Committee made clear, the rule "does not authorize relaxation of the rules of evidence but merely allows affidavits to be used as a vehicle for proof where permitted by law," such as under R. 1:6-6 which expressly authorizes the use of affidavits with respect to motion practice. But even R. 1:6-6 permits the court to "direct the affiant to submit to cross-examination, or hear the matter wholly or partly on oral testimony or depositions" where necessary to achieve justice.
The fact that our evidence rules expressly provide for introduction of certain hearsay statements "[w]hether or not the declarant is available as a witness," N.J.R.E. 803(c), does not make per se admissible a statement not being offered for its truth. To the contrary, there is a general requirement that "a proper foundation" *66 must be elicited and a document authenticated before it may be admitted into evidence, e.g., State v. Martini, 131 N.J. 176, 250, 619 A.2d 1208 (1993); N.J.R.E. 901, and in any event the construction of the Rules of Evidence must be to assure "that the truth may be ascertained and proceedings justly determined." N.J.R.E. 102; see also N.J.R.E. 403.
I am satisfied that the affidavits offered, even if not hearsay, were nevertheless inadmissible in the absence of any testimony as to their authentication, preparation or execution.
I join Points I, III and IV of the court's opinion, and concur in Point II for the reasons expressed herein.
NOTES
[1] The affidavits were clearly relevant to the nature of defendant's conduct for purposes of punitive damages, but in light of our conclusion on that issue, I need not weigh the impact of the affidavits with respect to that subject.
[2] If the person who prepared or took the affidavits testified, however, he or she might be subject to cross-examination about the number of persons solicited for affidavits who did not agree to execute same or voice the same policy.