**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3994-17T1

BALDWIN L. DON, a/k/a
BALDWIN DON, and
SHIRLEY DON, his spouse,

      Plaintiffs-Respondents,

v.

EDISON CAR COMPANY,
INC., d/b/a VOLVO OF
EDISON, a/k/a EDISON
CAR CO., INC., RICHARD
BRATEMAN, GEORGE
LYNK, BONDED OIL
COMPANY, LLC, a/k/a
BONDED OIL CO. LLC,
DAVID A. SOEL, and NEW
JERSEY MANUFACTURERS
INSURANCE COMPANY,

      Defendants,

and

CELE BRATEMAN,

      Defendant-Appellant.

_____

Submitted February 11, 2019 – Decided May 9, 2019

Before Judges Haas and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-0680-15.

Connell Foley LLP, attorneys for appellant (Kathleen S. Murphy, of counsel and on the brief).

Davis, Saperstein & Salomon, PC, attorneys for respondents (Christopher T. Karounos, of counsel and on the brief).

PER CURIAM

Defendant Cele Brateman appeals the trial court's April 27, 2018 order denying her motion for a new trial. The case arises from an August 2013 car accident in which plaintiff Baldwin L. Don sustained personal injuries. Defendant asserts that the jury verdict awarding $355,000 in damages to plaintiff and $45,000 to his wife was excessive, and that the jury was unduly influenced by the erroneous admission of hearsay testimony regarding a recommendation for surgery by a non-testifying medical expert. That error, defendant claims, was compounded by comments made by plaintiff's attorney in opening and closing statements referring to the surgery. Having reviewed the record and the governing legal authorities, we conclude that the trial court's evidentiary rulings allowing plaintiff to testify about a treatment recommendation and his reasons

2

A-3994-17T1

for not pursuing certain courses of treatment based on a hearsay exception was not an abuse of discretion. In addition, we find that the hypothetical question posed to the defense medical expert did not violate the rule against the admission of hearsay opinions as delineated in in <u>James v. Ruiz</u>, 440 N.J. Super. 45 (App. Div. 2015). Finally, to the extent that counsel's comments in summation exceeded the purpose for which the evidence was allowed, those comments were not clearly capable of producing an unjust result, and the verdict was otherwise supported by the evidence. Accordingly, as more fully explained below, we affirm.

I.

We glean the following facts from the record. On August 7, 2013, defendant's vehicle rear-ended a vehicle that then struck plaintiff's vehicle from the rear. Plaintiff's personal injury action against defendant proceeded to trial on February 20, 2018.[1] After defendant stipulated liability for the three-car rear end collision, the matter was tried on the issues of proximate causation and damages.

---

[1] Although plaintiff's complaint originally named as additional defendants Edison Car Company Inc. d/b/a Volvo of Edison, Richard Brateman, George Lynk, Bonded Oil Company LLC, and David A. Soel, the claims against the foregoing defendants were disposed of on motion. Accordingly, at the time of trial, Cele Brateman was the only remaining defendant.

A-3994-17T1

During his opening statement, plaintiff's counsel commented on certain evidence the jury could be expected to hear:

> [Plaintiff] will testify, as will the doctors, the pain symptoms he experiences. He will tell you that from August 2013 till now, the chiro [sic] didn't work, the PT didn't work. He had an epidural injection by Dr. Ragukonis, who is a certified--- Board certified pain management specialist. That helped a little bit, it wore off. Okay. He wanted to get more, there was approval issues. He wants to get surgery. He's scared of the surgery, he'll tell you. He wants to get the surgery. He can't get the surgery right now and hasn't been able to for a couple of years because of treatment that he is undergoing for a completely unrelated illness, nothing caused by the accident, but he' taking hormone therapy and different treatments for a cancer that he is suffering from. He still can't get the surgery until that's done. And, even then, the surgery will not – …remove the syrinx.

Defense counsel objected to counsel's reference to surgery, noting that none of plaintiff's three testifying medical experts had recommended or even mentioned surgery. In that regard, plaintiff's three medical witnesses had already testified in de bene esse depositions, and none of the videotaped testimony made any reference to surgery. Plaintiff's counsel contended that such testimony was not hearsay as it was not offered for the truth of the matter but "goes to [plaintiff's] state of mind and his pain and suffering" because after discussing surgery with his doctors it "weighed on his mind" and "goes to the

4

loss of enjoyment of life."  The court sustained the objection but refrained from instructing the jury to ignore the reference to surgery, believing it would only serve to highlight the objected-to remarks. The court directed that plaintiff's counsel should not comment further on the need for surgery further during his opening statement, but reserved ruling on whether plaintiff himself could testify about treatment options he was offered but did not pursue.

Opening statements then continued without incident, focusing on the primary issues in dispute:  (1) whether a syrinx[2] shown on plaintiff's MRI was caused by the accident and (2) whether plaintiff sustained a permanent injury as a result of the accident.  With regard to the second issue, defense counsel argued that:

> In reference to his claim of permanency, I submit to you, ladies and gentlemen, that Mr. Don's treatment for this claimed injuries [sic] do not warrant a finding of permanent injury. Again, he treated chiropractically for a number of months, received one epidural for the complaints of pain he had.  And that is the extent of any treatment that Mr. Don has.  He has not had any treatment since July if 2017.  And that was only three treatments in that year by a chiropractor.

---

[2]  A syrinx is defined as "[a] pathologic tubular cavity in the brain or spinal cord with a gliotic lining."  Stedmans Medical Dictionary 892430 (Updated Nov. 2014).  At trial, Dr. Ragukonis testified that a syrinx is "a fluid filled abnormality within the spinal cord itself."

5

Due to scheduling issues, the defense medical expert, Dr. Joseph Dryer, was taken out of turn resulting in his being the first expert to testify at trial. Prior to his testimony, on plaintiff's voir dire of Dr. Dryer concerning his qualifications, Dr. Dryer conceded that he was not a neurosurgeon, that only neurosurgeons perform surgery on syrinxes, and that he had never operated on a syrinx. He also admitted that in his forensic work for Examworks he performed 500 medical evaluations a year on behalf of defendants, earning a quarter million dollars for that work.

After the trial court nonetheless qualified Dr. Dryer as an expert, Dr. Dryer testified as to his medical evaluation of plaintiff and his review of the medical records. Dr. Dryer concluded that plaintiff's neurological and orthopedic examinations were both normal, and that there was no evidence of a spinal cord injury. Dr. Dryer did not discover any evidence of acute trauma or injury after reviewing plaintiff's MRI.

Dr. Dryer conceded that plaintiff's MRI revealed a syrinx in his cervical spine. He opined that the accident did not cause the syrinx and instead, the syrinx pre-dated the accident. Underlying this conclusion was the fact that he found no evidence of a spinal cord injury or spinal cord compression – two known causes of a syrinx. He also noted that a syrinx generally takes six months

6

after an accident to develop, and "it would be very unusual" to see a syrinx develop two months after the accident as plaintiff alleged. Ultimately, Dr. Dryer concluded that "the syrinx has been here for his whole life and it was here before the accident." For that reason, Dr. Dryer opined that plaintiff did not have a permanent injury from the car accident.

During cross-examination, plaintiff's counsel asked Dr. Dryer whether he had reviewed an October 19, 2016 consultation note from Dr. Arginteanu, a neurosurgeon, to Dr. Ragukonis, plaintiff's pain management doctor. Dr. Dryer testified that he had. Plaintiff's counsel then began to pose a question which referenced a recommendation for spinal fusion surgery by Dr. Arginteanu in that note, which was met by a timely objection by defense counsel. During the ensuing sidebar, defense counsel argued that the non-testifying expert's recommendation for surgery was an inadmissible hearsay opinion and that she would not have the opportunity to cross-examine the declarant. Plaintiff's counsel proffered that he would ask Dr. Dryer a hypothetical question if, based on the position of the syrinx, a three-level spinal fusion surgery would be a treatment option for plaintiff. The trial judge ruled that plaintiff's counsel would be permitted to ask this question in that generic, hypothetical form.

A-3994-17T1

In accordance with the court's ruling, plaintiff's counsel asked the following hypothetical question:

> Q: So Doctor, we were talking about a – a three level spinal fusion. . . . From an orthopedic standpoint, would that be a – a potential surgery that someone with a syrinx in that certain area could receive?

Dr. Dryer, unaware of the court's limitation on testimony about Dr. Arginteanu's note, asked a question in response.

> A: If you can just tell me, I – I looked at the note and it – it – he specified posterior versus anterior. Now if you said posterior, then I – I would disagree.
>
> Q: Only [be]cause you're asking Doctor, hang on one second. Posterior.
>
> A: Yeah, so I disagree with that.

Following Dr. Dryer's testimony, plaintiff presented videotaped de bene esse depositions of three medical experts: Dr. Kevin C. Yao, a board-certified neurosurgeon, Dr. Thomas P. Ragukonis, a board-certified pain management specialist, and Dr. Marc Daniel, a chiropractor. Dr. Yao testified that he had performed a medical evaluation of plaintiff. Based on his evaluation, Dr. Yao found that plaintiff reported "no symptomology with regard to neck or back pain" prior to the car accident, but experienced "various severe neck pain that failed to respond to the treatment measures such as pain management and

8

chiropractic treatment."  After reviewing plaintiff's MRI, Dr. Yao noted that plaintiff "has discogenic disease in his cervical spine meaning some degree of disc disease where the discs are not quite normally positioned."  Significantly, Dr. Yao identified a syrinx in plaintiff's spinal cord, which could bring about symptoms such as severe pain or difficulty moving, and noted that a syrinx could form as "a direct consequence of having trauma to the spine."  Dr. Yao noted that plaintiff displayed these symptoms.

Dr. Yao opined that plaintiff's syrinx was traumatically induced, and that plaintiff's discogenic disease predisposed him to having trauma to his spinal cord.  Specifically, Dr. Yao testified that "[i]t seems within a reasonable degree of medical certainty that [the] syrinx was caused by the trauma from the car accident."

In addition to opining that plaintiff's syrinx was traumatically induced, Dr. Yao testified that the syrinx was a permanent injury and that there was no treatment that a board-certified neurosurgeon could perform to restore plaintiff's spinal cord back to its original state.  Typically, according to Dr. Yao, a syrinx does not disappear and either remains the same or could worsen and cause further spinal cord dysfunction, resulting in loss of feeling, loss of strength, loss of bladder and bowel function.

Next the jury heard the videotaped testimony of Dr. Daniels, plaintiff's treating chiropractor. Dr. Daniels testified that plaintiff presented at this office two days after the accident with complaints of severe pain. During the examination, Dr. Daniels observed inflammation in plaintiff's cervical spine, as well as muscle spasms in his neck and back. He treated plaintiff with ice, gentle manipulation, heat, electrical muscle stimulation, and flexion distraction techniques. Dr. Daniels treated plaintiff about three times a week over the next two months, but plaintiff's pain was not improving with treatment. At that point, Dr. Daniels decided to refer plaintiff for additional diagnostic tests, including an MRI, in addition to continuing his treatment protocol.

After Dr. Daniels read plaintiff's MRI, he recommended that plaintiff visit a neurologist because he had several concerns about the findings on the MRI. He explained that plaintiff had "a manifestation of shooting pains" and felt it was "appropriate to get other opinions." Plaintiff continued to be treated by Dr. Daniels until July 2017, with visits gradually becoming less frequent. Dr. Daniels treated plaintiff four or five times in 2015, five times in 2016, and three times in 2017. In Dr. Daniels' opinion, plaintiff had sustained cervical radiculitis, panniculitis or inflammation affecting the sacrum, herniated disc, and persistent spasm as a result

A-3994-17T1

of the August 2013 accident. In Dr. Daniels' opinion, these were permanent injuries. Moreover, he testified that:

> I don't think anything is really going to dramatically improve [plaintiff's] condition. I don't think surgery will be clinically helpful or warranted, for that matter. And I don't think that any more treatment would really be helpful for this individual.

The videotaped testimony of Dr. Ragukonis, a pain management physician, was then played for the jury. Plaintiff saw Dr. Ragukonis in December 2014, sixteen months after the accident, after he failed to experience long-lasting results from his other treatments. As part of his initial evaluation, Dr. Ragukonis reviewed plaintiff's MRI and noted that plaintiff had a syrinx in his spinal cord. Dr. Ragukonis initially treated plaintiff with a muscle relaxant and anti-inflammatories, and ultimately with a surgical epidural injection. In total, Dr. Ragukonis treated plaintiff six times between December 2014 and December 2016.

Dr. Ragukonis offered no opinion as to when the syrinx appeared since it was outside of his area of expertise. He nevertheless concluded that the car accident was the reason plaintiff developed pain and sought out medical treatment, and that plaintiff's injuries were permanent.

11

A-3994-17T1

Plaintiff testified about the happening of the accident. He indicated that his vehicle was at a stop when it was hit from behind with such force that his vehicle was pushed forward into a median. Plaintiff identified photographs depicting the damage to his car and the other involved vehicles. Plaintiff admitted that although he was experiencing pain and stiffness in his back and neck, he told the police that he did not want to go the hospital. Instead, that evening, plaintiff attempted to schedule an appointment with Dr. Nichols, his primary care physician. Plaintiff was unable to schedule an appointment with Dr. Nichols, so the next day, he saw another doctor at the practice and then went to see Dr. Daniels, his chiropractor.

Plaintiff also testified that he was examined by three neurosurgeons, Dr. Yao, Dr. Roy Vingan, and Dr. Marc Arginteanu. Neither Dr. Vingan nor Dr. Arginteanu testified at trial. On direct examination of plaintiff, he was asked about treatment options that were discussed with the non-testifying neurosurgeons.

> [Plaintiff's counsel]: Okay. And I don't want to know the specifics of what you discussed with Dr. [Vingan] regarding reading the MRI, but did you discuss potential treatments for your condition with Dr. [Vingan]?
>
> [Plaintiff]: Yes.

A-3994-17T1

[Defense counsel]:  Objection, Your Honor.

. . . .

[Defense counsel]:  He's talking about what a doctor told him, Your Honor.

[The court]: That wasn't the question.  It was like did you discuss treatment and he didn't ask what he said.  He said did you discuss.

[Plaintiff's counsel]:  Okay without getting into the specifics of your discussion, what was your understanding of the type of treatment that you were looking for with Dr. [Vingan]?

[Defense counsel]:  Objection, Your Honor.  It's a backdoor.

At sidebar, plaintiff's counsel averred that the Dr. Vingan's recommendation for surgery was only being offered to show the effect on the listener – whether plaintiff chose to have surgery based on this recommendation and his reasoning for his choice.  Plaintiff's counsel proffered that plaintiff would "testify that there was other medical conditions that also made [him] uncomfortable for getting the surgery, but he is not going to say anything about what those conditions were or even what treatment he was receiving[.]"

Defense counsel maintained that plaintiff's "testimony in reference to a recommendation by a non-testifying [physician], the fact of what his state of mind was or what he heard somebody said goes right into the non-testifying expert's opinion as to whether or not surgery was required or recommended."

13

Defense counsel stressed that none of plaintiff's three testifying experts opined that plaintiff required surgery, and that plaintiff was offering these recommendations from non-testifying doctors to show the truth of the matter asserted – that plaintiff required surgery.

The trial court overruled the objection, reasoning:

> I already made a determination and [plaintiff] will be able to testify as to what treatment he underwent and that he did not follow one of the treatments and for whatever reasons it is and especially because that goes in conjunction with the testimony of . . . Dr. Daniel, which was the plaintiff's own doctor who indicated that he wouldn't even recommend it because he didn't think it would help or something like that.
> So, I mean there has been some information about surgery from Dr. Daniel and the impact or lack thereof that it would have on [plaintiff] and I believe that generic application – the generic application is allowable.

In accordance with this ruling, plaintiff testified that after reviewing plaintiff's MRI. Dr. Vingan recommended that plaintiff receive surgery on his cervical spine. Plaintiff did not pursue the surgery "because of the risks that were entailed and the level of pain that [he] was able to endure." Plaintiff also testified that Dr. Arginteanu, who worked in the same office as Dr. Yao, recommended surgery on his neck. Plaintiff wanted to pursue the surgery, but

14

did not because he was undergoing treatment for an unrelated medical condition at that time.

On cross-examination, plaintiff acknowledged that he had no scheduled appointments for any treatments or surgery for his injuries. He also acknowledged that his treatment since the accident was limited to three months of chiropractic treatment three times a week, followed by sporadic visits in 2014, 2015 and 2016, when he underwent an epidural injection, followed by additional chiropractic treatment in 2017.

On re-direct, plaintiff's counsel asked plaintiff if he wanted to get surgery, to which plaintiff responded that he did. Plaintiff's counsel then asked if plaintiff was going to get surgery once he was able, which was met by a timely objection by defense counsel. At sidebar, the judge ruled that the question was permissible, but directed plaintiff not to expand on the question because plaintiff "already gave a response to why he's not able to get [the surgery] right now." Accordingly, when plaintiff's counsel repeated the question after the sidebar, plaintiff testified that he would have the surgery once he was able, but did not have a surgery scheduled. Over another objection by defense counsel, plaintiff also testified that he felt like he needed the surgery based on his symptoms.

A-3994-17T1

In addition to detailing his treatment history, plaintiff testified about the impact the accident had on his life. Plaintiff indicated that "every day [he] wake[s] up with tension headaches that range in pain from a level two to a level four." He no longer engaged in certain activities that he formerly enjoyed, such as biking or playing tennis because of the "risk of throwing [his] neck out." Plaintiff also testified that he was either limited in being or unable to be intimate with his wife, and that his pain affected the way he traveled and worked. In sum, plaintiff stated that the pain he felt and the limitations from the syrinx would impact his life moving forward.

Plaintiff's wife testified that plaintiff was a very active person prior to the accident, but became less active afterwards. She also indicated that plaintiff was less social and more fatigued from the pain following the accident.

During summations, defense counsel argued that no doctor had testified that plaintiff required surgery for his injuries, which was met by an objection by plaintiff's counsel:

> You've heard testimony from plaintiff and plaintiff's wife that there was a recommendation of surgery. I submit to you, ladies and gentlemen that none of the doctors that testified here today, Dr. Yao, never recommended surgery. Dr. Ragakonis, never recommended surgery. Dr. Daniels, plaintiff's chiropractor, in fact, even said here was no surgery that he would recommend nor would it benefit [plaintiff].

 A-3994-17T1

The only reference you heard from surgery was from the plaintiff and the plaintiff's wife themselves. You never heard from any such doctor who recommended that surgery was to be performed.

[Plaintiff's attorney]:  Objection, Your Honor.  I loath to object on closing, but we need a sidebar.

During the ensuing sidebar, plaintiff's counsel argued that defense counsel misrepresented the record because Dr. Dryer testified that he reviewed Dr. Arginteanu's letter recommending surgery.  The trial court directed defense counsel to clarify to the jury that no <u>testifying</u> doctor had recommend surgery, and defense counsel did so when she resumed the summation.

Likewise, plaintiff's counsel also addressed plaintiff's need for surgery during his summation:

> [Plaintiff] spoke to three neurosurgeons.  He talked to Dr. [Vingan]. . . . He talked to Dr. Arginteanu. He talked to the neurosurgeons, discussed what was going on, did physical therapy, some vitamins, some other meds, okay?
> Ended up going on some pain killer's all right? Had to stop his activities, some normal activities. Ended up getting actual pain management and an epidural and was confirmed one hundred percent he needs surgery.
> He wants surgery.  There was a time he may have or may not have been able to do it personally but there was [an] issue that stopped it and now for other medical issues he can't for the time being.
> But when everything gets worked out, okay, he needs surgery.

17

Defense counsel did not object to these comments.

At the conclusion of the trial, the jury found that plaintiff sustained a permanent injury as a result of the car accident and awarded him $75,000 in damages for past pain and suffering and $280,000 for future pain and suffering. The jury also awarded Shirley Don $45,000 for the loss of plaintiff's services and consortium. On March 15, 2018, the trial court entered an order of judgment in the aggregate amount of $400,000 plus prejudgment interest.

Defendant moved for a new trial on March 16, 2018, arguing that the trial court erred in allowing plaintiff and Dr. Dryer to testify about recommendations for surgery from non-testifying medical experts, as well as allowing plaintiff's counsel to comment on plaintiff's need for surgery during his opening statement and summation. Defendant contended that the testimony and comments prejudiced the jury, and that the verdict was against the weight of the evidence.[3]

After holding oral argument on April 27, 2018, the trial court denied defendant's motion for a new trial in an oral decision. With respect to plaintiff's testimony relating to recommendation for surgery by non-testifying doctors, the

---

[3] Defendant's motion also alternatively sought remittitur of the damage award. In response, plaintiff filed a cross-motion for additur. The trial court denied both of these motions. Neither party challenges the denial of these motions on appeal.

A-3994-17T1

trial court reasoned that the testimony was offered to show the effect on the listener, not the truth of the matter asserted. Additionally, the trial court concluded that there was sufficient evidence to support the jury's verdict, and that the verdict did not shock the judicial conscience.

This appeal followed.

## II.

On appeal, defendant contends that the trial court "erred in admitting the finding of a non-testifying medical expert creating reversible error necessitating the reversal of the jury verdict." Specifically, defendant challenges the admission of such testimony during the direct examination of plaintiff and the cross-examination of Dr. Dryer. Defendant also argues that plaintiff's counsel improperly commented that plaintiff required surgery for his injuries during his opening statement and summation. Defendant maintains that the cumulative effect of the testimony and comments tainted the jury and resulted in a verdict that potentially included the recommendations for future surgery.

We review the denial of a motion for a new trial under the same standard that bound the trial court. Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011). We will disturb the trial court's ruling only if "it clearly and convincingly appears that there was a miscarriage of justice under the law." R.

19

4:49-1(a); see also Risko, 206 N.J. at 521 ("[A] motion for a new trial should be granted only where to do otherwise would result in a miscarriage of justice shocking to the conscience of the court." (internal quotation omitted)). A miscarriage of justice may "arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result." Risko, 206 N.J. at 521 (alterations in original) (quoting Lindemuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)). "On a motion for a new trial, all evidence supporting the verdict must be accepted as true, and all reasonable inferences must be drawn in favor of upholding the verdict." Boryszewski ex rel. Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005).

We also review a trial court's evidentiary rulings under a deferential standard. "When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "Thus, we will reverse an evidentiary ruling only if it 'was so wide [of] the mark that a manifest denial of justice resulted.'" Ibid. (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

20

## A.

We first turn to defendant's contention that the trial court erred when it allowed plaintiff to testify that Dr.'s Vingan and Arginteanu had recommended that plaintiff undergo surgery. It is well established that hearsay is not admissible at trial unless an exception applies. N.J.R.E. 802. Hearsay requires three elements: "(1) a 'statement;' (2) 'other than one made by the declarant while testifying at the [present] trial or hearing;' and (3) offered in evidence for its truth, i.e., 'to prove the truth of the matter asserted' in the statement." James v. Ruiz, 440 N.J. Super. 45, 59 (App. Div. 2015) (alteration in original) (quoting N.J.R.E. 801(c)).

If the statement is not offered for its truth, then by definition it is not hearsay. State v. Long, 173 N.J. 138, 152 (2002). Thus, out of court statements can be admissible not for their truthfulness, but to show a statement's effect on the listener. See Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 376 (2007) ("Where statements are offered, not for the truthfulness of their contents, but only to show that they were in fact made and that the listener took certain action as a result thereof, the statements are not deemed inadmissible hearsay." (quoting Russell v. Rutgers Cmty. Health Plan, 280 N.J. Super. 445, 456-57 (App. Div. 1995))).

A-3994-17T1

Therefore, some statements are "not objectionable as hearsay . . . [because they] are offered to explain plaintiff's actions, and not for the truthfulness of their content." Jugan v. Pollen, 253 N.J. Super. 123, 136-37 (App. Div. 1992) (holding that statements made to plaintiff regarding the limitations of his activity were not hearsay when "offered to prove offered to prove that plaintiff limited his activity based upon advice given to him."). Such an out-of-court statement, however, "frequently has an impermissible hearsay aspect as well as a permissible non-hearsay aspect." Spragg v. Shore Care, 293 N.J. Super. 33, 57 (App. Div. 1996). Thus, "the rule generally is to admit such evidence with a limiting instruction, unless the probative purpose of the statement is substantially outweighed by the danger of its improper use." Ibid.

Applying these standards, we conclude that the trial court did not exceed the bounds of its discretion when it permitted plaintiff to testify about the recommendations for surgery for the purpose of showing that the statements were in fact made and that plaintiff took certain actions in response. Even assuming that the evidence had a hearsay component, when a statement has both an impermissible hearsay aspect and a permissible non-hearsay aspect, a court should generally "admit such evidence with a limiting instruction, unless the probative purpose of the statement is substantially outweighed by the danger of its improper use." Spragg,

293 N.J. Super. at 57. Here, the MRI scan finding of a syrinx was undisputed and the statements did not pertain to the central disputed issue of causation. Rather, plaintiff simply testified that he was provided with a treatment option and the reasons he did not pursue the treatment at the time. Although this testimony suggests that plaintiff required surgery for his injuries, it more directly goes to the effects of the recommendations on plaintiff – namely, that he had not yet followed through with surgery because of the risks entailed and the other treatment he was receiving for an unrelated illness, but that he would consider undergoing surgery in the future.[4] Defense counsel ably countered this testimony on cross-examination and closing by pointing out that no surgery was scheduled.

For these reasons, in the circumstances presented in this case, we find that the trial court's ruling that plaintiff could testify to the recommendations for surgery does not amount to "a clear error in judgment" and was not "so wide [of] the mark that a manifest denial of justice resulted." Griffin, 225 N.J. at 413. Because we find no abuse of discretion in allowing plaintiff to testify about the surgical treatment option, plaintiff's counsel's remarks in opening, which

---

[4] To be sure, the trial court could have issued a limiting instruction during plaintiff's testimony, but defendant did not request such a limiting instruction.

A-3994-17T1

accurately set forth the evidence the jury would hear, were permissible pursuant to the court's evidentiary ruling and are therefore not a basis to reverse the verdict.

B.

We next address defendant's contention that the trial court erred in allowing plaintiff's counsel to elicit testimony from Dr. Dryer about Dr. Arginteanu's treatment recommendation. Defendant contends that plaintiff's cross-examination of Dr. Dryer ran afoul of the standards set forth in James v. Ruiz, 440 N.J. Super. 45, requiring reversal. We disagree.

In James, we held that an attorney may not "question[ ] an expert witness at a civil trial, either on direct or cross-examination, about whether that testifying expert's findings are consistent with those of a non-testifying expert who issued a report in the course of an injured plaintiff's medical treatment" if "the manifest purpose of those questions is to have the jury consider for their truth the absent expert's hearsay opinions about complex and disputed matters." 440 N.J. Super. at 51. The plaintiff's expert in James opined that plaintiff's CT scan showed a disc bulge, whereas the defendant's expert opined that there was no disc bulge shown on the CT scan. Id. at 71. The opinion of plaintiff's expert was consistent with that of the interpreting radiologist, who was not testifying

24

at trial. Id. at 71-72. We held that the plaintiff could not ask a medical expert witnesses whether their reading of the CT scan was consistent or inconsistent with that of a non-testifying radiologist, thereby utilizing the radiologist's report as a "tie breaker" on the contested issue of whether plaintiff had disc bulges. See ibid.

In this case, the question posed to Dr. Dryer did not seek to establish that his opinion was "consistent" with Dr. Argintineu's opinion; rather it simply asked whether Dr. Dryer himself felt that a fusion was an appropriate treatment for a syrinx. Plaintiff's counsel did not attempt to use Dr. Arginteanu's recommendation to show that Dr. Dryer disregarded relevant facts or to present Dr. Arginteanu's treatment recommendation as a "tie breaker" between competing expert opinions. In that regard, there was no "tie" to break: Dr. Yao testified he did not believe any future treatment by a neurosurgeon would cure the syrinx, and Dr. Daniels testified that in his opinion plaintiff would not benefit from surgery.

We thus conclude that the cross-examination of Dr. Dryer did not run afoul of the standards set forth in James. The trial court correctly ruled that the hypothetical question that was posed to Dr. Dryer was entirely permissible. See Townsend v. Pierre, 221 N.J. 36, 58 (2015) ("The use of hypothetical questions

in the presentation of expert testimony is permitted by N.J.R.E. 705, provided that the questions include facts admitted or supported by the evidence." (internal quotation omitted)). The oblique reference to Dr. Arginteanu's note was engendered by Dr. Dryer's failure to respond to the leading hypothetical question with a simple "no." Instead, Dr. Dryer asked a question in response, whether it was a posterior or anterior fusion. The doctor then answered no, he did not agree with that. We find no error in the trial court's evidentiary ruling, and the cursory and indirect reference to the note by Dr. Dryer is not a basis to overturn the verdict.

## C.

Finally, we address defendant's contention that plaintiff's counsel impermissibly argued that plaintiff needed surgery for his injuries during summation. As detailed above, plaintiff's counsel argued in summation that plaintiff "one hundred" percent needed surgery for his injuries. Defendant argues that these comments improperly used the challenged hearsay from non-testifying doctors to support that plaintiff required surgery.

Indisputably, these comments exceeded the purpose for which the trial court ruled the evidence admissible. Defense counsel, however, did not object during plaintiff's summation. See DiMaria Const., Inc. v. Interarch, 351 N.J.

Super. 558, 570 (App. Div. 2001) (quoting Bradford v. Kupper Assocs., 283 N.J. Super. 556, 573-74 (App. Div. 1995)) ("The failure to object suggests that counsel 'perceived no error or prejudice, and, in any event, prevented the trial judge from remedying any possible confusion in a timely fashion.'"). Accordingly, we review the trial court's failure to strike these comments during summation for plain error and will reverse only if this failure was "clearly capable of producing an unjust result." R. 2:10-2.

At the outset, "[a]s a general matter, 'counsel is allowed broad latitude in summation [and] counsel may draw conclusions even if the inferences that the jury is asked to make are improbable, perhaps illogical, erroneous or even absurd.'" Bender v. Adelson, 187 N.J. 411, 431 (2006) (quoting Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999)); see also Model Jury Charges (Civil), 1.12(c), "Role of the Attorneys (approved Oct. 2009) ("In their opening statements and in their summations [the attorneys] have given you their views of the evidence and their arguments in favor of their client's position. While you may consider their comments, nothing that the attorneys say is evidence and their comments are not binding upon you." (emphasis added)).

In this case, defense counsel effectively discredited plaintiff's purported need for surgery by emphasizing in summation that no testifying doctors had

recommended surgery. Although plaintiff's counsel implicitly relied on inadmissible hearsay when arguing that plaintiff did in fact need surgery, he did not specifically mention Dr. Vingan or Dr. Arginteanu. In other words, plaintiff did not directly reference any challenged hearsay to refute defense counsel's argument that only plaintiff testified that he needed surgery. Considering the wide latitude provided to attorneys to make arguments during summation, and mindful that defense counsel's failure to object during summation deprived the trial judge of the opportunity to remedy any error in a timely fashion, we do not find that plaintiff's counsel comments rise to the level of plain error.

Moreover, we find that contrary to defense counsel's argument, the objected-to remarks were not clearly capable of causing the jury to ignore its duty to render a verdict based on the evidence at trial and not on speculation. In that regard, with respect to the central disputed issue of causation, the jury had to resolve the conflicting opinions of Dr. Yao and Dr. Dryer regarding the origin of plaintiff's syrinx. In summation, plaintiff's counsel emphasized Dr. Yao's superior qualifications as a board-certified neurosurgeon who is experienced with performing spinal cord surgeries, and the fact that less than one percent of his practice was devoted to forensic work. By contrast, Dr. Dryer is a board-certified orthopedist who is qualified to perform surgeries on the bones around

the spinal cord but not on the spinal cord itself, and he conducts roughly 500 defense medical examination annually earning a quarter million dollars for that work.  On this basis, the jury could reasonably find Dr. Yao's testimony more credible than Dr. Dryer's.  Furthermore, because neither Dr. Yao nor Dr. Dryer's testimony focused on whether plaintiff required surgery, the fleeting comments in summation regarding plaintiff's need for surgery are unlikely to have influenced the jury's credibility determinations on these competing experts.

With respect to damages, we likewise find no indication in the record that the jury impermissibly awarded an excessive damages award based on the fact the plaintiff was offered surgery for his injuries.  In accordance with the model jury charge, the trial judge instructed the jury:  "The plaintiff's claim in this case does not include any claims for medical expenses.  Therefore, in determining the reasonable amount of damages due to plaintiff, you shall not speculate upon or include medical expenses as a part of the damages."  Model Jury Charges (Civil), 8.20(c) "Medical Expenses (Auto)" (rev. Jan. 2017).  "We presume the jury followed the court's instructions."  State v. Smith, 212 N.J. 365, 409, 54 A.3d 772, 797 (2012) (citing State v. Loftin, 146 N.J. 295, 390 (1996)).  Thus, we presume that the jury did not award damages specifically for future surgical costs and instead focused on compensating plaintiff for his pain and suffering.

29

In this regard, we uphold the trial judge's finding that the jury's award of damages does not shock the judicial conscience. The time-unit rule, Rule 1:7-1(b), permits an attorney to "suggest to the trier of fact, with respect to any element of damages, that unliquidated damages be calculated on a time-unit basis without reference to a specific sum." Accordingly, in summation, plaintiff's counsel pointed out that plaintiff had a life expectancy of 23.9 years, or 209,364 hours, and asked the jury to use its "collective wisdom [to] com[e] up with what is the value of one hour of the pain, suffering, loss of enjoyment of life and issues that [plaintiff] has faced up until now and will fact for the rest of his life knowing he has that syrinx." When calculated to an hourly rate, the jury's award of $75,000 for past pain and suffering amounts to $5.63 per hour for an eight-hour day,[5] and the jury's award of $280,000 for future pain and suffering equals only $4.01 per hour for an eight-hour day.[6] Viewing the evidence in the light most favorably to plaintiff, we see no reason to disturb the

---

[5] The date of the accident, August 7, 2013, to the last day of trial February 27, 2018, spans 1665 days. $75,000 ÷ 1,665 days = $45.04 per day. $45.04 ÷ 8 hours = $5.63 per hour.

[6] 23.9 years life expectancy equals 8,733 days. $280,000 ÷ 8733 days = $32.06 per day. $32.06 ÷ 8 hours = $4.01 per hour.

A-3994-17T1

trial court's finding that the amount of the award did not shock the judicial conscience.

### D.

In summary, we find no reason to disturb the jury's verdict and affirm the trial court's denial of defendant's motion for a new trial. To the extent we have not specifically addressed any remaining arguments raised by defendant, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3994-17T1